## UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

**TRENISS JEWELL EVANS III,**

    **Plaintiff,**

        v.

**WILLIAM SHIPLEY,**

    **Defendant.**

**Civil Action No. 24-377 (JEB)**

## MEMORANDUM OPINION

On March 10, 2022, Plaintiff Treniss Jewell Evans III pled guilty to one count of Entering and Remaining in a Restricted Building or Grounds for his presence at the U.S. Capitol on January 6, 2021. Newly enamored with the court system, Evans has now filed this diversity action against Defendant William Shipley, an attorney who briefly assisted in his criminal defense. Evans brings three claims against Shipley: breach of the fiduciary duties of confidentiality and loyalty, intentional infliction of emotional distress, and defamation and false-light invasion of privacy. In response, Defendant now moves to dismiss, asserting legal defects in all three claims. Analyzing each in turn, the Court finds that only Plaintiff's IIED cause of action should be dismissed, and it will therefore deny Defendant's Motion as to the rest.

## I.    Background

### A.  Factual Background

As always for such a Motion, the Court draws on the facts as pled in the Amended Complaint, assuming them to be true. See Sparrow v. United Air Lines, Inc., 216 F.3d 1111, 1113 (D.C. Cir. 2000). The Court also properly takes judicial notice of the undisputed facts set

1

forth regarding Plaintiff's criminal case, including the Government's Sentencing Memorandum. See Baker v. Henderson, 150 F. Supp. 2d 17, 19 n.1 (D.D.C. 2001) ("[T]he court may take judicial notice of matters of a general public nature, such as court records," in adjudicating a motion to dismiss.).

This convoluted story, like many these days, began with Evans's participation in the January 6, 2021, insurrection.  He was arrested nearly two months later on criminal charges relating to his actions during the breach of the U.S. Capitol that interrupted the certification of the electoral vote count for the 2020 election.  See ECF No. 8 (Am. Compl.), ¶ 5.  For his criminal defense in the case, Evans retained John Pierce of the John Pierce Law Firm in Woodland Hills, California.  Id.  Pierce briefly enlisted Shipley to assist in Evans's defense.  Id. In February 2022, Shipley allegedly spoke to Evans once about an "extradition" motion that the latter wanted to file.  Id., ¶¶ 5–6.

On March 10, 2022, Evans ultimately pled guilty to one count of Entering and Remaining in a Restricted Building or Grounds, and he was sentenced on November 21, 2022, to 36 months of probation, including 20 days of intermittent incarceration, a $5,000 fine, and a $500 restitution payment.  See ECF No. 9 (MTD) at 2; see also United States v. Evans III, No. 21-225 (D.D.C.), ECF No. 32 (Plea Agreement) & Minute Entry of Nov. 21, 2022.  The Government's Sentencing Memorandum asserted that "Evans has made statements on social media demonstrating a lack of genuine remorse and has raised money off his participation in the January 6 attack," citing his social-media posts, crowd-funding efforts, personal website, and media interviews.  Evans III, ECF No. 40 (Gov't Sentencing Memo) at 2, 11–15.

Fast forward to just over a year later, and Defendant began tweeting about Evans and his ongoing fundraising efforts.  On April 9, 2023, Shipley tweeted the following to "his well over

100,000 followers," Am. Compl., ¶ 6: "Treniss (i.e. EVANS) pain in the ass. John (i.e. Pierce) asked me to talk to him (i.e. EVANS) about an idiotic 'extradition' motion he wanted to file b/c some moron paralegal told him it was valid." Id.  Another tweet read, "[I]t took 45 minutes to discuss it with him (i.e. EVANS).  It was like trying to explain the law to a 1st Grader.  It didn't matter how many times I told him the statute he was looking at did not apply to his case, he kept making the same stupid argument." Id.  A third tweet that same day stated, "You're an idiot and you're grifting off J6 cases," allegedly directed toward Evans.  Id.

Between that day and as recently as February 6, 2024, Shipley continued posting tweets that Plaintiff describes as disclosures of "confidential communications," "outrageous," and "defamatory." Id., ¶¶ 6, 20.  Defendant pulls no punches; indeed, the tweets in question are replete with colorful language, calling Plaintiff "dumb as a lamp post," a "sack of sheet grifter," "idiotic," and a "fraud." Id., ¶¶ 8, 19–20.

Two tweets in particular are relevant to the Court's analysis.  A November 1, 2023, tweet read: "I was wondering why I have not seen any posts from @CondemnedUSA Treniss Evans lately.  That fraud blocked me.  LOL.  I guess calling out his grifting was taking too much of a chunk out of his income stream.  Please do not donate to him.  He is a stream of non-stop inaccurate information and uses the donations to avoid getting a real job." Id., ¶ 19 (emphasis omitted).  Plaintiff notes that this tweet has received "4, 384 [sic] views and counting." Id.  Defendant followed up with a lengthy December 19, 2023, tweet that "specifically stated that EVANS was/is 'involved in a grift and fraud' related to raising funds for the defense of persons charged with J6 cases." Id., ¶ 8.  Plaintiff generally alleges that Shipley "has tweeted many comments over the last several months and up to the date of the filing of this lawsuit wherein he

3

accused EVANS of soliciting funds for the defense of J6 cases and illegally using those funds for his own personal expenses." Id.

Evans's initial Complaint, filed on February 8, 2024, contained three counts: one for breach of the fiduciary duties of confidentiality and loyalty, another for intentional infliction of emotional distress, and a third for defamation. See ECF No. 1 (Compl.), ¶¶ 10–18. Defendant filed a Motion to Dismiss on May 15, 2024. Just under two weeks later, Plaintiff filed an Amended Complaint, adding under Count Three a claim for false-light invasion of privacy, in response to which Defendant filed a second Motion to Dismiss. This Motion is now ripe.

## II.     Legal Standard

Rule 12(b)(6) provides for the dismissal of an action where a complaint fails to "state a claim upon which relief can be granted." Although "detailed factual allegations" are not necessary to withstand a Rule 12(b)(6) motion, Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007), "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (internal quotations marks and citation omitted). In weighing a motion to dismiss, a court "may consider only the facts alleged in the complaint, any documents either attached to or incorporated in the complaint[,] and matters of which [the court] may take judicial notice." EEOC v. St. Francis Xavier Parochial School, 117 F.3d 621, 624 (D.C. Cir. 1997). The court "must treat the complaint's factual allegations as true and must grant [the] plaintiff 'the benefit of all inferences that can be derived from the facts alleged.'" Sparrow., 216 F.3d at 1113 (quoting Schuler v. United States, 617 F.2d 605, 608 (D.C. Cir. 1979)) (internal citations omitted). It need not accept as true, however, "a legal conclusion couched as a factual allegation" or an inference

unsupported by the facts set forth in the complaint.  Trudeau v. FTC, 456 F.3d 178, 193 (D.C. Cir. 2006) (quoting Papasan v. Allain, 478 U.S. 265, 286 (1986)).

## III.   Analysis

In moving to dismiss, Shipley maintains that all of Evans's common-law claims as pled are facially defective.  The Court addresses them in turn.

### A.   Breach of Fiduciary Duties

In Count I, Plaintiff alleges that Defendant breached fiduciary duties owed to him — namely, the duties of confidentiality and loyalty.  See Am. Compl., ¶ 13.  Given that it is exercising diversity jurisdiction, the Court begins by deciding what law to apply, a determination governed by District of Columbia choice-of-law rules.  See, e.g., Liberty Mut. Ins. Co. v. Travelers Indem. Co., 78 F.3d 639, 642 (D.C. Cir. 1996) (explaining that "[a] federal court sitting in diversity applies the choice of law rules of the forum state").  D.C.'s choice-of-law rules "require that we apply the tort law of the jurisdiction that has the most significant relationship to the dispute . . . [considering] where the injury occurred, where the conduct causing the injury occurred, the domicile, residence, nationality, place of incorporation and place of business of the parties, and the place where the relationship is centered."  Wu v. Stomber, 750 F.3d 944, 949 (D.C. Cir. 2014) (cleaned up).

Plaintiff alleges in the Amended Complaint that "a substantial part of the events or omissions giving rise to this claim occurred in this district" since his causes of action arose out of Shipley's representation of him in his criminal case in this courthouse.  See Am. Compl., ¶ 4.  Defendant does not contest that D.C. law applies, and both parties cite to D.C. precedent in their briefings.  The Court therefore relies on that body of law.  See Abbas v. Foreign Policy Group, LLC, 783 F.3d 1328, 1338 n.6 (D.C. Cir. 2015) (concluding D.C. defamation law governed case

involving online article when plaintiff alleged conduct that caused injury took place in D.C., defendants agreed, and parties relied on D.C. law in briefings).

Under D.C. law, accordingly, Plaintiff must establish that "(1) defendant owed plaintiff a fiduciary duty; (2) defendant breached that duty; and (3) to the extent plaintiff seeks compensatory damages — the breach proximately caused an injury." Paul v. Judicial Watch, Inc., 543 F. Supp. 2d 1, 5–6 (D.D.C. 2008). This Court has previously explained that "[i]t is axiomatic that the attorney-client relationship is fiduciary in nature," Guo Wengui v. Clark Hill, PLC, 440 F. Supp. 3d 30, 36 (D.D.C. 2020), and the D.C. Court of Appeals has specifically recognized that lawyers owe their clients a fiduciary "duty of confidentiality" and "duty of loyalty." Herbin v. Hoeffel, 806 A.2d 186, 197 (D.C. 2002).

Sidestepping these elements, Defendant's sole point of attack on this count is that "[e]motional distress, without accompanying injury, does not suffice" to make out breach of fiduciary duty. See MTD at 4. It is a well-aimed jab in the sense that the only injury in the Amended Complaint for which Evans specifically seeks damages is "mental anguish . . . for the emotional pain, torment, and suffering he has experienced." Am. Compl., ¶ 28. On the law, however, Shipley's attempt is half baked.

More specifically, he does not identify any caselaw holding that this particular claim — breach of fiduciary duty — requires something more than emotional injury. To be sure, he points to D.C. precedent addressing the limited circumstances under which negligently inflicted emotional distress is a cognizable injury. See MTD at 5 & n.4 (citing Hedgepeth v. Whitman Walker Clinic, 22 A.3d 789, 795 (D.C. 2011) (specifying that special relationships that "involve fiduciary obligations" do not create a duty of care to avoid causing emotional distress when "neither the purpose of the relationship nor the fiduciary's undertaking is to care for the

plaintiff's emotional well-being; rather the object of the engagement is to obtain a financial,

commercial or legal objective").  But he does not establish that a fiduciary-duty claim is so

analogous to NIED that this point of D.C. law should control, and the Court is aware of no D.C.

cases specifically addressing the matter.

Indeed, other jurisdictions have taken varying approaches to this issue.  Although there is

disagreement on whether a fiduciary-duty claim is more akin to a negligent tort or an intentional

one, some courts have indicated that, regardless, emotional distress can be enough.  Compare

Gracey v. Eaker, 837 So.2d 348, 350–56 (Fla. 2002) (permitting breach-of-fiduciary-duty-of-

confidentiality claim — for only emotional damages — to proceed as exception to Florida's

impact rule because of severity of emotional distress and nature of fiduciary relationship in that

context); with Aller v. Law Office of Carole C. Schriefer, P.C., 140 P.3d 23, 26–30 (Colo. App.

2005) (characterizing fiduciary breach as negligence and affirming summary judgment against

plaintiff since emotional distress is typically unrecoverable for negligence claims but noting that

"[w]e can foresee circumstances where a breach of fiduciary duty may be characterized as

something other than professional negligence, for example, where an attorney abuses a position

of trust with the client by siphoning a client's funds for personal gain"); and Coon v. Hudson

United Bank Corp., 2003 WL 22757713, at *1–3 (N.Y. App. Term Oct. 15, 2003) (finding that

plaintiffs' emotional-distress claim did not "rise to the required level" in instant case but

suggesting claim for those damages could be sufficient if plaintiff's physical safety was

implicated by breach of duty and emotional distress was "serious and verifiable") (citation

omitted); see generally Deborah A. DeMott, Breach of Fiduciary Duty: On Justifiable

Expectations of Loyalty and Their Consequences, 48 Ariz. L. Rev. 925, 931 (2006) (noting

fiduciary duty is "relegated to an uncharacterized category of miscellany"); see also Brian M.

Serafin, <u>Comparative Fault and Contributory Negligence as Defenses in Attorney Breach of Fiduciary Duty Cases</u>, 21 Geo. J. Legal Ethics 993, 1000 (2008) ("Courts have split on whether breach of fiduciary duty is an intentional tort.").

What is more, courts in this district have suggested that at least some breach-of-fiduciary-duty claims are not best characterized as sounding in negligence.  See <u>Foltz v. U.S. News & World Rep., Inc.</u>, 627 F. Supp. 1143, 1154 n.18 (D.D.C. 1986) ("A breach of the fiduciary duty of loyalty, as opposed to the fiduciary duty of care, would seem to be an intentional wrong."); <u>First Am. Corp. v. Al-Nahyan</u>, 17 F. Supp. 2d 10, 27 (D.D.C. 1998) (differentiating "simple negligence" claim for "breach of the lawyer's duty of care" from "breach of the duty of loyalty") (citation omitted).

Because Defendant's legal backing for his point is too thin and because even a brief survey of the law elsewhere suggests that emotional-distress damages might be available, the Court declines to dismiss Count I at this stage.  Shipley may certainly return at summary judgment if he can accumulate more ammunition in the interim.

B.  <u>IIED</u>

Next up is Count II.  To make out an IIED claim under D.C. law, Evans must allege that Shipley's (1) extreme and outrageous conduct (2) intentionally or recklessly (3) caused him to suffer severe emotional distress.  See <u>Duncan v. Children's Nat'l Med. Ctr.</u>, 702 A.2d 207, 211 (D.C. 1997).  The conduct must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community."  <u>Kerrigan v. Britches of Georgetowne, Inc.</u>, 705 A.2d 624, 628 (D.C. 1997) (citation omitted).  The Court has previously noted that "mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities" do not beget IIED liability.  <u>Asare v. LM-DC</u>

8

<u>Hotel, LLC</u>, 62 F. Supp. 3d 30, 36 (D.D.C. 2014) (citation omitted); <u>see also</u> Def. Reply at 4.  As the Shipley tweets in question appear to be no more than that, the Court finds that they do not meet the high standard for IIED.

Plaintiff retorts that <u>Herbin</u>, 806 A.2d at 197, in denying a motion to dismiss an IIED claim, held that "high value" is placed on a "lawyer's duty of loyalty and to preserve client confidences."  Pl. Opp. at 10.  The plaintiff there alleged that his public-defense lawyer provided information to criminal prosecutors enabling them to serve a search warrant on him.  <u>Herbin</u>, 806 A.2d at 189. The allegations in this case, of mere embarrassing public statements that did not in any way affect Plaintiff's criminal case, are far less severe.  <u>Cf.</u> <u>Williams v. Callaghan</u>, 938 F. Supp. 46, 52 (D.D.C. 1996) (holding lawyer's failure to interview potential witnesses, make any pre-trial motions, move for mistrial, cross-examine witness, and generally zealously advocate at trial did <u>not</u> constitute IIED).

On top of that, Plaintiff's cause of action clearly falls on the third criterion.  In general, "embarrassment and difficulty do not approach the level required to support an IIED claim." <u>Cooper v. District of Columbia</u>, 548 F. Supp. 3d 170, 184 (D.D.C. 2021) (internal quotation marks and citation omitted).  Under D.C. law, emotional distress requires a showing beyond mere "mental anguish and stress," manifestations must be "of so acute a nature that harmful physical consequences are likely to result."  <u>Competitive Enterprise Institute v. Mann</u>, 150 A.3d 1213, 1261 (D.C. 2016) (internal citations omitted); <u>see</u> MTD at 7; <u>cf.</u> <u>Cooper</u>, 548 F. Supp. 3d at 184 (finding difficulty sleeping and embarrassment insufficient for IIED); <u>Wood v. Neuman</u>, 979 A.2d 64, 78 (D.C. 2009) (finding that plaintiff who was "horrified," "constantly crying and almost sleepless," "shaken at her arrest," and "embarrassed at having been made out to be a 'pariah' in the neighborhood" could not maintain IIED claim because distress was insufficiently

severe); <u>Bakeir v. Capital City Mortg. Corp.</u>, 926 F. Supp. 2d 320, 341 (D.D.C. 2013) (holding

that plaintiff who experienced only "general distress, embarrassment, and unhappiness" did not

meet IIED standard).  In the Amended Complaint, Evans alleges "mental anguish" for

"emotional pain, torment, and suffering," Am. Compl., ¶ 28, but provides no supportive facts or

concrete manifestations of the emotional toll he has suffered.  He thus does not clear the requisite

pleading threshold for a sufficient IIED cause of action.

     The Court, therefore, easily dispenses with this count.

     C.  <u>Defamation and False-Light Invasion of Privacy</u>

     On to Count III, which technically alleges two torts, defamation and false-light invasion

of privacy.  Under District law, these two are analyzed together when relying on identical

underlying allegations, <u>see</u> <u>Blodgett v. University Club</u>, 930 A.2d 210, 222-23 (D.C. 2007),

which Plaintiff acknowledges is the case here.  <u>See</u> Am. Compl., ¶ 18.  Given that "a plaintiff

may not avoid the strictures of the burdens of proof associated with defamation by resorting to a

claim of false-light invasion," the Court will begin with Evans's defamation cause of action.  <u>See</u>

<u>Klayman v. Segal</u>, 783 A.2d 607, 619 (D.C. 2001) (quoting <u>Moldea v. New York Times Co.</u>, 22

F.3d 310, 319 (D.C. Cir. 1994)) (dismissing false-light claim for same reason as defamation

claim); <u>see also</u> MTD at 7–8.

     As a threshold matter, this Court must address Defendant's contention that his speech is

entitled to the heightened constitutional protections afforded to statements about public figures

and that Plaintiff must therefore carry the greater pleading burden of actual malice.  <u>See</u> MTD at

10; <u>New York Times Co. v. Sullivan</u>, 376 U.S. 254, 279–80 (1964).  The Supreme Court laid out

two categories of public figures in <u>Gertz v. Robert Welch, Inc.</u>, 418 U.S. 323 (1974): (1) an

individual who has "achieve[d] such pervasive fame or notoriety that he becomes a public figure

for all purposes and in all contexts"; and (2) more commonly, an individual who "voluntarily injects himself or is drawn into a particular public controversy and thereby becomes a public figure for a limited range of issues." Id. at 351.  The appropriate categorization is a "matter of law for the court to decide." Tavoulareas v. Piro, 817 F.2d 762, 772 (D.C. Cir. 1987).

Although Defendant's Motion does not specify whether Evans is a general or limited-purpose public figure, see MTD at 10; see also Waldbaum v. Fairchild Publications, Inc., 627 F.2d 1287, 1292 (D.C. Cir. 1980) (using these terms to describe two categories in Gertz), the former designation certainly does not apply to Evans, who has observably not achieved "pervasive fame." Gertz, 418 U.S. at 351.  The Court thus tees up the D.C. Circuit's three-part inquiry for limited-purpose public figures: (1) whether the relevant controversy is a public controversy; (2) whether the plaintiff played a significant role in that controversy; and (3) whether the defamatory statement is germane to the plaintiff's participation in that controversy. Waldbaum, 627 F.2d at 1296-98; see also Jankovic v. Int'l Crisis Group, 822 F.2d 576, 585 (D.C. Cir. 2016) (summarizing the Waldbaum test).

The Court accepts that the overt, heated debates over both the aftermath of January 6 and the charging and prosecution decisions made by the Department of Justice, constitute a public controversy, which Waldbaum describes as "a real dispute, the outcome of which affects the general public or some segment of it in an appreciable way."  627 F.2d at 1296.  Such controversy is evident from judicially noticeable online postings by former President Trump and relevant news articles.  E.g. Donald J. Trump (@realDonaldTrump), Truth Social (Mar. 11, 2024, 7:55 PM), https://truthsocial.com/@realDonaldTrump/posts/112079753989223875 (promising to, if elected, "free" January 6 "hostages" who are "wrongfully imprisoned"); Alan Feuer & Maggie Haberman, Inside Donald Trump's Embrace of the Jan. 6 Rioters, *New York*

*Times* (Apr. 13, 2024) (quoting Trump saying January 6 defendants "have been treated

unfairly"); Sarah Fortinsky, Trump Calls Jan. 6 Defendants "Warriors," *The Hill* (Jun. 09, 2024,

9:46 PM), https://thehill.com/homenews/campaign/4713140-trump-calls-j6-defendants-warriors/

(quoting Trump calling January 6 defendants "warriors" and "victims of what happened"); see

also United States v. Flynn, 507 F. Supp. 3d 116, 126 n.6 (D.D.C. 2020) (taking judicial notice

of Trump tweet); Noble v. D.C., 2024 WL 1213319, at *1 n.1 (D.D.C. Mar. 20, 2024) (taking

judicial notice of *Washington Post* articles).

   Even so, Shipley presents no proof that Plaintiff plays a significant role in this

controversy, thus leaving the Court unable to find under prong two that Plaintiff "achieved a

'special prominence' in the debate." Waldbaum, 627 F.2d at 1297.  Indeed, Defendant does not

engage with the three prongs of limited-purpose public-figure analysis at all.  He simply asserts

that "Plaintiff is a public figure for purposes of defamation law" — without specifying between

general and limited purpose — because he "made a career out of his involvement in the events of

January 6," speaking publicly and fundraising, and "'had access to channels of communication to

defend [himself].'"  MTD at 10 (citing Lohrenz v. Donnelly, 350 F.3d 1272, 1280 (D.C. Cir.

2003)).  But the D.C. Circuit has established that "[t]rivial or tangential participation [in a

controversy] is not enough.  The language of Gertz is clear that plaintiffs must have 'thrust

themselves to the forefront' of the controversies so as to become factors in their ultimate

resolution." Waldbaum, 627 F.2d at 1297.  The extent of Plaintiff's public-facing engagements

and press coverage, as well as the "public reaction to his conduct and statements," therefore

matters to the Court's analysis.  Id.  Although the Government's Sentencing Memorandum

makes clear that Evans was capitalizing on attention from the events of January 6 for media

exposure and fundraising endeavors, see MTD at 2, Defendant does not present sufficient

evidence of Plaintiff's public profile to render him a limited purpose public figure at this juncture.

Evans thus clears the first hurdle: his defamation claim can stand without an allegation of actual malice.  But there are further obstacles to surmount.  His pleading must now meet the four elements of a defamation cause of action under D.C. law, which he does not contest applies. They are: "(1) that the defendant made a false and defamatory statement concerning the plaintiff; (2) that the defendant published the statement without privilege to a third party; (3) that the defendant's fault in publishing the statement amounted to at least negligence; and (4) either that the statement was actionable as a matter of law irrespective of special harm or that its publication caused the plaintiff special harm."  Deripaska v. Associated Press, 282 F. Supp. 3d 133, 140–41 (D.D.C. 2017) (citation omitted), see also Am. Compl., ¶ 17.

Starting with the first element, a legally defamatory statement, at its core, must "reasonably [imply] false and defamatory facts."  Milkovich v. Lorain Journal Co., 497 U.S. 1, 20 (1990).  At the motion-to-dismiss stage, determining whether a defamation claim is actionable implicates three "threshold . . . questions of law for the court to decide," Farah v. Esquire Magazine, 736 F.3d 528, 535 (D.C. Cir. 2013): whether a defendant's statements can be "construed as representations of fact," whether they can be provably verified or falsified, and whether they are "reasonably capable of defamatory meaning."  Id. at 534–35 (citations omitted); see also MTD at 8.  Many of the statements relayed in Evans's Amended Complaint founder on the first two inquiries.  The Court finds Shipley's general name-calling — e.g., stating that Evans is "dumb as a lamp post" and a "sack of sheet grifter," Am. Compl., ¶ 20 — to be non-actionable expressions of opinion.  These statements are better characterized as "loose, figurative, or hyperbolic language" than as statements "sufficiently factual to be susceptible of being proved

true or false." Milkovich, 497 U.S. at 21; see MTD at 7–8; cf. Montgomery v. Risen, 875 F.3d 709, 714 (D.C. Cir. 2017) (defendant's commentary characterizing plaintiff as "maestro" (derogatory) and plaintiff's product as an "elaborate and dangerous hoax[]" constituted hyperbolic commentary that could not serve as basis for liability); cf. also Solomon v. Dechert LLP, 2023 WL 6065025, at *13 (D.D.C. Sept. 18, 2023) (calling plaintiff's uncontested actions "fraud," when used to mean "unethical behavior," "plainly amount[ed] to an expression of opinion . . . not a false statement about what [plaintiff] did or did not do").

For some of Shipley's tweets, however, the analysis looks different.  On November 1, 2023, he tweeted: "I guess calling out his grifting was taking too much of a chunk out of his income stream.  Please do not donate to him.  He is a stream of non-stop inaccurate information and uses the donations to avoid getting a real job."  Am. Compl., ¶ 19.  On December 19, 2023, he followed up with a lengthy tweet that included the statement that Evans is "'involved in a grift and fraud' related to raising funds for the defense of persons charged with J6 cases."  Id., ¶ 8. Although Plaintiff never reproduced the full tweet, the Court offers a fuller excerpt below to include some context around the language Plaintiff quoted:

> Since his case was resolved, Evans has now taken up J6 "advocacy" as his job, traveling around the country, and in and out of DC trying to raise "awareness" -- and a lot of money -- with various angles like any good carnival barker.  I'm guessing his travel and living expenses are all funded out of the donations he brings in.
>
> When I found that new GSG site, and called out Lang, Evans, and the listed attorneys for being involved in a grift and fraud, they quickly altered the language -- deleting the names of specific attorneys and taking out the part about Evans and Lang being responsible for deciding how the money would be spent (or IF it would be spent).

@Shipwreckedcrew, X (December 19, 2023, 10:58 AM), https://perma.cc/MN5Z-9C96; see Flynn, 507 F. Supp. 3d at 126 n.6 (taking judicial notice of tweet).  Evans also alleges that

Shipley "has tweeted many comments over the last several months and up to the date of the

filing of this lawsuit wherein he accused EVANS of soliciting funds for the defense of J6 cases

and illegally using those funds for his own personal expenses," Am. Compl., ¶ 8, but he never

cites the other precise tweets that he refers to here.

     In any event, the above-quoted specific assertions of financial misconduct go beyond

mere name-calling and colorful invectives.  The allegations have concrete factual implications

and cannot be characterized as unverifiable opinions simply "reflect[ing] one person's subjective

view of the underlying conduct."  Armstrong v. Thompson, 80 A.3d 177, 188 (D.C. 2013)

(finding vague allegations of "serious integrity violations" and "gross misconduct" to be

characterizations of alleged misconduct that themselves were "not verifiable as true or false");

contra MTD at 9.  Rather, the question of whether Evans is furtively siphoning donations from

charitable funds raised for January 6 defendants into his own income stream is a factual one that

can be either substantiated or refuted.

     Indeed, the D.C. Circuit has previously held that "[a] classic example" of a defamatory

statement with "a precise meaning . . . [that] thus is likely to give rise to clear factual

implications . . . is an accusation of a crime."  Ollman v. Evans, 750 F.2d 970, 980 (D.C. Cir.

1984) (citing both a definite accusation of criminal conduct like "rape" and a "somewhat less

well defined accusation that a 'judge is corrupt'" as actionable defamatory statements) (citations

omitted) (emphasis added).  Although this tweet falls on the "less well defined" side of the

spectrum, it intimates facts that reflect potential criminal conduct — facts that Evans sufficiently

pleads are "completely false."  Am. Compl., ¶ 21.

     These tweets are also clearly capable of a defamatory meaning.  A statement is

defamatory if it "tends to injure the plaintiff in his trade, profession or community standing, or

lower him in the estimation of the community," <u>Moss v. Stockard</u>, 580 A.2d 1011, 1023 (D.C. 1990), and if it is "more than unpleasant or offensive," making the plaintiff appear "odious, infamous, or ridiculous." <u>Howard Univ. v. Best</u>, 484 A.2d 958, 989 (D.C. 1984) (citation omitted); <u>see also</u> Am. Compl., ¶ 17. Arguable criminal allegations — at the very least, allegations of unethical behavior — are certainly enough to constitute this type of reputational harm. <u>See</u> <u>Westfahl v. Dist. of Columbia</u>, 75 F. Supp. 3d 365, 375 (D.D.C. 2014) (noting "false allegation of criminal wrongdoing is defamation *per se*").

The Court can more straightforwardly check off the second (publication), third (fault), and fourth (harm) elements of Plaintiff's defamation claim. As to the second prong, Plaintiff alleges that Shipley published the statements to thousands of viewers on Twitter (now X) — *e.g.*, 4,384 in the case of the November 1, 2023, tweet, <u>see</u> Am. Compl., ¶ 19 — without any privilege to do so. On the third, at a minimum, Evans alleges that Shipley "is aware of the falsity of his many allegations that EVANS is a 'grifter' or that he is involved in 'grifting' individuals because he has offered absolutely no evidence in any form to support such an obviously defamatory statement." <u>Id.</u>, ¶ 9. In fact, Evans cites Shipley's February 9, 2024, tweet ("I have been sued by Treniss Evans. I love the rules of discovery. Buckle up buttercup.") as an indicium that he has "no evidence" and plans to use the discovery process "to determine if his defamatory statements and offensive comments are in fact true." <u>Id.</u>, ¶¶ 22–23; <u>but see</u> MTD at 11 ("Far from demonstrating that Mr. Shipley had serious doubts about his criticisms of plaintiff, the tweet instead evinces Mr. Shipley's confidence that discovery will vindicate his view that plaintiff is a fraud who is grifting off the J6 cases.") Concerning the fourth, although "special damages" are "limited to actual pecuniary loss," <u>FAA v. Cooper</u>, 566 U.S. 284, 295 (2012), which Plaintiff

does not allege, "[d]efamation as a matter of law" includes "false statements that impute to the subject a crime." Franklin v. Pepco Holdings, Inc., 875 F. Supp. 2d 66, 75 (D.D.C. 2012).

For the same reasons, Plaintiff successfully pleads his false-light claim (with regard to these two particular tweets) under D.C. law, which requires a showing of: "(1) publicity; (2) about a false statement, representation or imputation; (3) understood to be of and concerning the plaintiff; and (4) which places the plaintiff in a false light that would be offensive to a reasonable person." Doe v. Bernabei & Wachtel, PLLC, 116 A.3d 1262, 1267 (D.C. 2015) (citation omitted). Unlike a defamation claim, which "redresses damage to reputation," a false-light action "redresses mental distress from having been exposed to public view." White v. Fraternal Order of Police, 909 F.2d 512, 518 (D.C. Cir. 1990). Here, the allegation of unethical activity is offensive for the same reason that it has a defamatory meaning. Of note, "[b]ecause the two torts are so similar, a plaintiff may only recover on one of the two theories based on a single publication, but is free to plead them in the alternative." Weyrich v. New Republic, Inc., 235 F.3d 617, 628 (D.C. Cir. 2001) (cleaned up).

The Court therefore denies the Motion on this final count, allowing Plaintiff's defamation and false-light causes of action to proceed as to the two aforementioned tweets.

## IV.   Conclusion

For the foregoing reasons, the Court will deny Defendant's Motion to Dismiss as to Counts I and III and will grant it as to Count II.  A separate Order consistent with this Opinion will be issued this day.

/s/ *James E. Boasberg*
JAMES E. BOASBERG
Chief Judge

Date:  July 30, 2024